******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* ELIZABETH K. TURNER
## (SC 20360)

Robinson, C. J., and McDonald, D'Auria,
Kahn, Ecker, and Keller, Js.

*Syllabus*

Convicted of robbery in the first degree and felony murder, among other crimes, the defendant appealed. The defendant's convictions stemmed from her involvement in the murders of the victims, B and B's son, P. Prior to the murders, the defendant and her husband, C, lived in B's home. The defendant devised a scheme in order to steal from B, pursuant to which the defendant instructed C to tell B that the defendant had been arrested and that he needed money to bail the defendant out of jail. B acquiesced and gave C the money, which C and the defendant used to buy drugs. Subsequently, the defendant and C returned to B's home, where the defendant heard an altercation and subsequently witnessed C stabbing P. The defendant did not intercede, and, according to a statement the defendant later made to the police, it was apparent to her at that point that B may have already been dead. After the killings, the defendant went through B's purse and removed money and personal items, and the defendant and C jointly sold B's and P's personal property for cash. In her appeal before the Appellate Court, the defendant claimed that the trial court's instructions violated her due process rights on the ground that the court, in referring to a larceny by false pretenses in its instructions on the first degree robbery and felony murder charges, improperly presented the jury with a legally invalid but factually supported basis for finding her guilty with respect to those charges. In support of this claim, the defendant argued that a larceny by false pretenses could not, as a matter of law, serve as the predicate felony for robbery and felony murder. The Appellate Court concluded that the trial court's references to larceny by false pretenses presented the jury with a legally valid basis for conviction, albeit one that was factually unsupported by the evidence presented at trial, and that the improper inclusion of the factually unsupported theory was harmless because the post murder larcenies also presented the jury with a legally valid and factually supported alternative basis for finding the defendant guilty of robbery and felony murder. The Appellate Court affirmed the judgment of conviction, and the defendant, on the granting of certification, appealed to this court. *Held* that the jury having been instructed on an alternative theory of conviction that was legally valid and factually supported by the evidence, the Appellate Court properly upheld the defendant's conviction of first degree robbery and felony murder: a larceny by false pretenses that precedes the use of force can satisfy the larceny element of robbery if the force is used in order to retain the property immediately after the taking, and, therefore, the trial court's references to larceny by false pretenses in its instructions presented the jury with a legally valid theory for finding the defendant guilty of robbery and felony murder; nevertheless, because the evidence established that the defendant and C completed their scheme to take money from B under the pretense that it was to bail the defendant out of jail before B and P were murdered, that scheme could not serve as a factual basis for finding the defendant guilty of robbery or felony murder, and, accordingly, the trial court's references to larceny by false pretenses in its instructions in connection with that scheme was improper; however, the submission of this factually unsupported theory of guilt to the jury did not violate the defendant's due process rights because the jury was provided with a legally valid and factually supported alternative basis for conviction insofar as the jury was instructed that it could find the defendant guilty of first degree robbery and felony murder on the basis of her participation in the larcenies that occurred after the murders were committed, and this alternative theory of criminal liability was amply supported by the evidence.

Argued March 24—officially released August 31, 2021*

Substitute information, in the first case, charging the defendant with the crimes of conspiracy to commit larceny in the third degree and accessory to larceny in the third degree, substitute information, in the second case, charging the defendant with three counts of the crime of robbery in the first degree, two counts of the crime of felony murder, and with one count each of the crimes of criminal attempt to possess narcotics, larceny in the third degree, burglary in the third degree, hindering prosecution in the second degree, forgery in the second degree, conspiracy to commit robbery in the first degree, and tampering with evidence, and substitute information, in the third case, charging the defendant with the crimes of larceny in the second degree, using a motor vehicle without the owner's permission, and forgery in the second degree, brought to the Superior Court in the judicial district of Waterbury, where the cases were consolidated; thereafter, the case was tried to the jury before *Cremins, J.*; verdicts and judgments of guilty, from which the defendant appealed; subsequently, the Appellate Court, *Lavine, Prescott, and Bright, Js.*, which affirmed the judgments of the trial court, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Ronald G. Weller*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Terence D. Mariani* and *Cynthia S. Serafini*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

KAHN, J. This certified appeal requires us to consider whether the defendant's convictions of robbery in the first degree in violation of General Statutes § 53a-134 (a) (1) and felony murder in violation of General Statutes § 53a-54c should be reversed due to the trial court's references to larceny by false pretenses in its instructions to the jury on both offenses. The defendant, Elizabeth K. Turner, appeals from the judgment of the Appellate Court affirming her conviction on sixteen counts,[1] including three counts of robbery in the first degree and two counts of felony murder, for her involvement in the murder of Donna Bouffard and her son, Michael Perkins (Perkins).[2] The defendant contends that the trial court, by referring to larceny by false pretenses in its instructions, improperly presented the jury with a legally invalid but factually supported basis for finding her guilty of both robbery and felony murder. The Appellate Court rejected that claim, concluding that the trial court's instructions, although improper, provided the jury with a legally valid but factually unsupported basis for finding the defendant guilty and, as a result, did not impact her due process right to a fair trial. See *State* v. *Turner*, 190 Conn. App. 693, 709–15, 212 A.3d 715 (2019). The Appellate Court further held that the trial court's instructional error was harmless because the jury had a legally valid and factually supported alternative basis for finding the defendant guilty of robbery and felony murder. Id., 711–15. We affirm the judgment of the Appellate Court.

The jury reasonably could have found the following relevant facts based on the evidence presented at trial. In February, 2012, Bouffard invited the defendant and her husband, Claude Turner, both of whom were homeless at the time, to live with her in her Watertown home. Bouffard's generosity was an extension of a kindness first offered by her daughter, Christine Perkins, who, after seeing the Turners at a Waterbury mall and recognizing Claude Turner from a Salvation Army food line, invited the Turners to stay with her and her mother. Bouffard provided the Turners with their own room on the second floor.

At the beginning of April, 2012, Bouffard received a disability settlement in the amount of $13,000. After using a portion of the settlement to pay various bills, Bouffard put the remaining $7000 in an envelope and hid it under her bed. When she noticed that some of the money was missing, she took the remaining cash and placed it in a safe in her living room. Bouffard accused the defendant and Claude Turner of the theft, but allowed them to remain in her home.

On April 19, 2012, Bouffard traveled to Vermont for a brief vacation with a friend. Prior to her departure, Bouffard served eviction papers on her daughter and

her daughter's husband, David Ortiz, so that her son, Perkins, could move back into her home after having moved out following a dispute with Ortiz. While Bouffard was away, the defendant directed her husband to break into the safe with a crowbar in order to access the remainder of the money obtained from the disability settlement. Claude Turner complied, and the couple stole approximately $6000, all of which they used to purchase drugs. When Bouffard returned from Vermont and discovered the open, empty safe, she reported the larceny to the police. In early May, 2012, Bouffard asked the Turners to move out of her home. The couple refused to leave.

The relationship between the Turners and Bouffard deteriorated rapidly following the theft. In the ensuing months, the defendant expressed to her husband and their close friend, Anthony Acosta, that she wanted to put rat poison in Bouffard's and Perkins' food. After her arrest, the defendant told the police that Bouffard frequently complained about being unhappy and that she found such complaints to be condescending. She also admitted that she and Bouffard argued frequently during this period.

On June 28, 2012, the defendant devised a new scheme to steal from Bouffard. She instructed her husband to go to Bouffard and tell her that the defendant had been arrested and that he needed $50 to bail her out of jail. Bouffard acquiesced and gave Claude Turner the money, which he and the defendant used to buy drugs. Later that same day, again at the direction of the defendant, Claude Turner returned to Bouffard and told her the bond was actually $100. Bouffard again gave Claude Turner $50, and the couple used the money to purchase more drugs.

Just after midnight on June 29, 2012, the Turners returned to Bouffard's home, where Perkins was asleep on a couch and Bouffard was awake in her room. According to the defendant's statement to the police following her arrest, Bouffard began "running her mouth" soon after they arrived. Hoping to avoid a confrontation, the defendant went upstairs and turned on a television in the room that she shared with her husband. Interested in what was going on downstairs, the defendant lowered the sound on the television so that she could listen in.

Soon thereafter, the defendant heard "banging" and "wrestling" noises. The defendant also heard Perkins yell, "[j]ust stop" and "[p]lease stop, I love you." (Internal quotation marks omitted.) The defendant then started to walk down the stairs but stopped when she saw Claude Turner stabbing Perkins in the stomach. The defendant did not intercede, and, according to her statement to the police, it was at that moment that she realized that Bouffard was likely dead because the room to her door was closed despite Perkins' pleas for help.

After seeing the defendant, Claude Turner told her to return upstairs, which she promptly did.

Immediately after the killings, Claude Turner walked upstairs and handed Bouffard's purse to the defendant. The defendant went through the purse and removed $200, multiple gift cards, and the keys to Bouffard's car. The defendant then walked down the stairs, past the mutilated bodies of Perkins and Bouffard, and searched for the paperwork for Bouffard's car. The defendant and her husband then drove Bouffard's car to Waterbury, where they picked up Acosta and purchased marijuana and cocaine. The three then returned to Bouffard's home and used the drugs. At trial, the jury heard former testimony from Acosta that, while they were sitting in the Turners' room, the defendant said that she regretted telling her husband to kill Bouffard and Perkins. When the defendant discovered an eviction notice while searching through Bouffard's belongings, she remarked to Acosta, "good for them. They deserved it."

Over the next several days, the defendant, Claude Turner, and Acosta sold a variety of items they stole from the house, including Bouffard's camper, phone, and jewelry, and Perkins' scooter, guitar, and a video game console. The defendant later admitted to the police that she and her husband had jointly decided to sell the various items for cash. The defendant also attempted to withdraw money from Bouffard's bank account using a forged check but was turned away by a skeptical bank teller. On Friday, July 6, 2012, one week after the murders, the defendant and her husband sold Bouffard's car for $400.

The defendant and her husband were ultimately arrested in Baltimore, Maryland, and the defendant waived extradition to Connecticut.[3] The defendant was charged with sixteen offenses. Relevant to the present appeal, the defendant was charged, in the second case, with felony murder as to Bouffard and Perkins in counts one and two, respectively, and robbery in the first degree as to Bouffard and Perkins in counts nine and ten, respectively. At trial, the prosecutor argued that the defendant had engaged in a continuous sequence of larcenous conduct, beginning with the bail scheme and culminating in the theft of the victims' property after the murders. At the conclusion of the state's case-in-chief, defense counsel moved for a judgment of acquittal on the ground that the defendant did not plan or participate in the murder and, as a result, could not be guilty of felony murder or robbery. The prosecutor, in response to the motion, argued that the timing of the murders elevated both the bail scheme larceny and the larcenies committed after the murders to robberies. The trial court denied the motion.

At an on-the-record charging conference held the following day, defense counsel argued that the state's "continuing course of conduct" theory was inappropri-

ate for closing argument on the felony murder counts because the bail scheme had ended prior to the use of force. The trial court disagreed, concluding that whether the bail scheme, as part of a continuous course of conduct, could serve as the predicate felony for felony murder was a question of fact for the jury. The trial court reasoned: "The cases in the brief that was filed by the state in the hearing [on] probable cause do stand for the proposition, in my view, that there can be a continuing course of conduct from a point prior to the murders . . . that can be argued as a continued course of conduct, which would encompass the underlying predicate robbery for the felony murder. . . . My conclusion, further, is that whether or not it is a continuing course of conduct is a fact[ual] issue that has to be decided by the jury."

In its instructions to the jury on the counts of robbery and felony murder, the trial court defined the crime of larceny by false pretenses when it described the larceny element of robbery. The trial court instructed the jury in relevant part: "Larceny simply means theft or stealing. Larceny also includes obtaining property by false pretenses. 'False pretense' means a false representation of fact." The trial court referred to larceny by false pretenses a total of three times in its instructions on robbery and felony murder.

Aside from the various references to larceny by false pretenses, the trial court's instructions hewed closely to the model instructions for robbery and felony murder. See Connecticut Criminal Instructions 5.4-1 and 6.4-1, available at https://www.jud.ct.gov/JI/Criminal/Criminal.pdf (last visited August 20, 2021). When it instructed the jury on the felony murder charges in counts one and two of the second case, the trial court explained that, in order to find the defendant guilty, it had to find that the killings occurred "in the course of, and in furtherance of the commission or attempted commission of the crime of robbery . . . ." The trial court further noted that " '[i]n the course of the commission' of the robbery or attempted robbery means during any part of the defendant's participation in the robbery or attempted robbery." The trial court also instructed the jury that the killing must "in some way be causally connected to, or as a result of, the robbery . . . ." The jury subsequently returned verdicts finding the defendant guilty on all counts. See *State* v. *Turner*, supra, 190 Conn. App. 695–96. Thereafter, the trial court rendered judgments of conviction in accordance with the verdicts and sentenced the defendant to sixty years of incarceration. Id., 700.

On appeal to the Appellate Court, the defendant claimed, inter alia,[4] that the trial court's instructions on the charges of robbery and felony murder violated her due process right to a fair trial because the court's various references to larceny by false pretenses permit-

ted the jury to base its guilty verdict on a legally invalid but factually supported theory of guilt. See *State* v. *Turner*, supra, 190 Conn. App. 704–705. In support of this claim, the defendant argued that a larceny by false pretenses cannot, as a matter of law, serve as the predicate felony for robbery and felony murder. Id., 709. According to the defendant, the trial court's reference to larceny by false pretenses created the impression that the jury could find her guilty of robbery and felony murder based on the larceny by false pretenses at issue in this case, namely, the bail scheme. Id., 700–702. The defendant argued that, because the instructions contained a legally invalid theory, the jury's general verdicts must be reversed under *Stromberg* v. *California*, 283 U.S. 359, 51 S. Ct. 532, 75 L. Ed. 1117 (1931). *State* v. *Turner*, supra, 704–705.

The Appellate Court rejected the defendant's claim and held that, although the trial court's references to larceny by false pretenses were improper, the instructional error presented the jury with a legally *valid* theory that was factually unsupported by the evidence presented at trial. Id., 709–10. Relying on our decision in *State* v. *Chapman*, 229 Conn. 529, 643 A.2d 1213 (1994), the Appellate Court held that the inclusion of the factually unsupported theory was harmless because the post murder larcenies also presented the jury with a legally valid and factually supported alternative basis for finding the defendant guilty. See *State* v. *Turner*, supra, 190 Conn. App. 715. This certified appeal followed.[5]

Before turning to the defendant's specific claim on appeal, we begin by reviewing the legal principles relevant to our consideration of claims of instructional error involving multiple theories of guilt on a single count. We have previously recognized the important distinction between instructional errors that present the jury with a legally valid but factually unsupported theory of liability and those that provide the jury with a legally *invalid* basis for convicting the defendant. In *Chapman*, we noted that "the United States Supreme Court has held that a factual insufficiency regarding one statutory basis, which is accompanied by a general verdict of guilty that also covers another, factually supported basis, is not a federal due process violation." *State* v. *Chapman*, supra, 229 Conn. 539; see also, e.g., *State* v. *Burton*, 258 Conn. 153, 162–65, 778 A.2d 955 (2001). In such cases, the inclusion of a legally valid but factually unsupported theory of liability in the instructions does not implicate the due process rights of the defendant because a jury is well equipped to differentiate between factually supported and factually unsupported theories of guilt. See *State* v. *Chapman*, supra, 539; see also *Griffin* v. *United States*, 502 U.S. 46, 56–59, 112 S. Ct. 466, 116 L. Ed. 2d 371 (1991).

A jury is not, however, "equipped to determine

whether a particular theory of conviction submitted to [it] is contrary to law . . . .'' (Internal quotation marks omitted.) *State* v. *Chapman*, supra, 229 Conn. 539. As a result, if a jury is provided with a legally invalid alternative basis for finding the defendant guilty and the jury returns a general verdict of guilty, the defendant's due process rights are violated, and the conviction must be reversed unless the state can show that "the jury *necessarily* found facts to support the conviction on a valid theory." (Emphasis added.) *State* v. *Cody M.*, 337 Conn. 92, 116, 259 A.3d 576 (2020); see also *Hedgpeth* v. *Pulido*, 555 U.S. 57, 58, 129 S. Ct. 530, 172 L. Ed. 2d 388 (2008).

In the present appeal, the defendant contends that the Appellate Court incorrectly concluded that the trial court's instructions presented the jury with a legally valid but factually unsupported basis for finding her guilty of robbery and felony murder. Specifically, the defendant argues that the Appellate Court incorrectly determined that a person who obtains property through false pretenses and later uses force to retain that property can, as a matter of law, be convicted of robbery or felony murder. According to the defendant, a larceny by false pretenses can never serve as a legally valid predicate for robbery and felony murder, and, as a result, the trial court's instructions violated her due process rights by providing the jury with a legally invalid basis for finding her guilty. Citing this court's recent decision in *State* v. *Cody M.*, supra, 337 Conn. 92, the defendant argues that her conviction on the charges of robbery and felony murder must be reversed because the state cannot establish that the jury made the factual findings necessary to support her conviction on a legally valid alternative theory. We disagree.

We begin our analysis of the defendant's claim by examining the Appellate Court's conclusion that, under certain circumstances, a larceny by false pretenses can serve as the predicate felony for robbery and felony murder. In support of its conclusion, the Appellate Court offered the following hypothetical: "Suppose that, during the course of the bail scheme, [Perkins] glanced out [of] the window and saw the defendant in the car. If he exclaimed, after Bouffard has handed over the money, that the defendant was not in jail but was outside, and Turner immediately used physical force in order to retain possession of the money, then the larceny by false pretenses could have been a proper predicate for a robbery." *State* v. *Turner*, supra, 190 Conn. App. 709. We agree with the Appellate Court's reasoning and conclude that a larceny by false pretenses that precedes the use of force can satisfy the larceny element of robbery under General Statutes § 53a-133 if the force is used in order to retain the property immediately after the taking.[6] See General Statutes § 53a-133 ("[a] person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of

physical force upon another person for the purpose of . . . the retention [of the property] *immediately after the taking* [of the property]" (emphasis added)). As we have consistently recognized, a larceny that occurs either "immediately before or after" the use of force can serve as the predicate larceny for robbery under § 53a-133. *State* v. *Ghere*, 201 Conn. 289, 297, 513 A.2d 1226 (1986). We, therefore, conclude that the trial court's references to larceny by false pretenses in its charge presented the jury with a legally *valid* theory for finding the defendant guilty of robbery and felony murder.[7] See *Griffin* v. *United States*, supra, 502 U.S. 59 (noting that theory of conviction is legally invalid if charged conduct "is protected by the [c]onstitution, is time barred, or fails to come within the statutory definition of the crime"); see also, e.g., *United States* v. *Desnoyers*, 637 F.3d 105, 109 (2d Cir. 2011).

We now must consider whether this legally valid theory was supported by evidence presented at trial. According to the Appellate Court, the evidence established that the bail scheme "was complete[d] before the victims were murdered," and, as a result, it could not serve as the factual basis for finding the defendant guilty of robbery and felony murder. *State* v. *Turner*, supra, 190 Conn. App. 709–10. On the basis of our review of the record, we agree with the Appellate Court. During trial, testimony established that, on the evening of June 28, 2012, Claude Turner and the defendant fraudulently acquired $100 from Bouffard and promptly used that money to purchase drugs. After midnight on June 29, 2012, the defendant and Claude Turner returned to Bouffard's home, and, following an argument with Bouffard, Claude Turner killed both Bouffard and Perkins. By the time the victims were murdered, the proceeds of the bail scheme had been spent. Additionally, no evidence was presented at trial that Claude Turner's use of force was connected to the bail scheme or that he attacked Bouffard for the purpose of "[p]reventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking . . . ." General Statutes § 53a-133. Due to the absence of any evidence connecting the killings to the completed bail scheme, we conclude that this theory of criminal liability was factually unsupported, and, as a result, the trial court's inclusion of larceny by false pretenses in its instructions on robbery and felony murder was improper. See, e.g., *State* v. *Reid*, 193 Conn. 646, 667 n.22, 480 A.2d 463 (1984) (noting that "[i]t is error for a court to submit to a jury as a basis for a conviction any statutory alternative ground unsupported by the evidence").

Having determined that the instructions improperly presented the jury with a legally valid but factually unsupported theory of conviction, "we must determine whether: (1) the error is constitutional or nonconstitutional in nature; and (2) whether it was harmful." *State*

v. *Chapman*, supra, 229 Conn. 537. As we have previously noted, the submission of a factually unsupported theory of guilt does not violate the constitutional rights of a defendant, as long as the trial court's instructions also provided the jury with a legally valid *and* factually supported basis for conviction. Id., 539–44; see also, e.g., *State* v. *Berger*, 249 Conn. 218, 238–39, 733 A.2d 156 (1999).

In her brief, the defendant concedes that her participation in the larcenies that occurred after Bouffard and Perkins were killed provided the jury with a legally valid basis for finding her guilty of both robbery and felony murder.[8] The trial court specifically instructed the jury that, in order to find the defendant guilty of felony murder, it had to find that a "death occurred during . . . any part of the defendant's *participation* in the robbery or attempted robbery." (Emphasis added.) The trial court also instructed the jury that it needed to find that the death was "in some way . . . causally connected to, or as a result of, the robbery . . . ." As the defendant concedes, these instructions presented the jury with a legally valid basis for finding the defendant guilty of robbery and felony murder based on the larcenies committed after the murders.[9]

We also agree with the Appellate Court's assessment that this alternative theory of liability was amply supported by evidence contained in the record. As the Appellate Court noted, the evidence established, among other things, that (1) the defendant told the police that Claude Turner would do anything for her in order to keep her happy; (2) she twice directed Claude Turner to steal Bouffard's money, first when it was under Bouffard's bed and then again when it was in the safe; (3) she did not intervene when she saw Claude Turner stabbing Perkins; (4) she searched through Bouffard's purse and stole money, gift cards, and car keys immediately after the murders; (5) she walked past the bodies of Bouffard and Perkins when searching for the paperwork for Bouffard's car; (6) she and Claude Turner used the money from Bouffard's purse to purchase drugs; (7) they, along with Acosta, used the drugs in Bouffard's home shortly after the murders; (8) she told Acosta that she regretted telling Claude Turner to kill Bouffard and Perkins; and (9) she stated in a letter that she wrote from prison that she had "made a huge mistake" that resulted in "lives [being] lost."[10] (Internal quotation marks omitted.) *State* v. *Turner*, supra, 190 Conn. App. 700, 712. As the Appellate Court aptly noted, "[t]hese facts, and others, provided a basis for the jury to have concluded beyond a reasonable doubt that at least the killing of Bouffard was planned in advance and was designed to gain possession of her money and property, and that . . . Perkins was killed because he was a witness and/or attempted to intervene." Id., 712–13.

Our conclusion that the jury was instructed on an

alternative theory of conviction that was both legally valid and factually supported is sufficient to reject any nonconstitutional claim of instructional error. See, e.g., *State* v. *Chapman*, supra, 229 Conn. 542 ("we have consistently held that submission of an instruction for which there was no basis in the evidence is subject to harmless error analysis"). In the present case, the defendant cannot establish that the trial court's error more probably than not affected the jury's verdict because the trial court's instructions provided the jury with a legally valid and factually supported alternative basis for finding her guilty of robbery and felony murder. When a jury is presented with multiple legally valid theories of conviction, only one of which is unsupported by the evidence presented at trial, "we assume that the jury found the defendant guilty under the supported allegation, rather than the unsupported allegation." Id., 543–44.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

* August 31, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The defendant was convicted of two counts of felony murder in violation of General Statutes (Rev. to 2011) § 53a-54c, one count of attempt to possess narcotics, in violation of General Statutes § 53a-49 and General Statutes (Rev. to 2011) § 21a-279 (a), one count of larceny in the third degree, in violation of General Statutes § 53a-124 (a), one count of burglary in the third degree, in violation of General Statutes § 53a-103 (a), one count of hindering prosecution in the second degree, in violation of General Statutes § 53a-166 (a), one count of forgery in the second degree, in violation of General Statutes § 53a-139 (a) (1), two counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (1), one count of robbery in the first degree in violation of § 53a-134 (a) (3), one count of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-134 (a), one count of tampering with physical evidence in violation of General Statutes (Rev. to 2011) § 53a-155 (a) (1), one count of conspiracy to commit larceny in the third degree in violation of §§ 53a-48 (a) and 53a-124 (a), one count of accessory to larceny in the third degree in violation of General Statutes §§ 53a-8 (a) and 53a-124 (a), one count of larceny in the second degree in violation of General Statutes § 53a-123 (a) (1), and one count of using a motor vehicle without the owner's permission in violation of General Statutes § 53a-119b (a) (1).

[2] The defendant was convicted of two counts of robbery in the first degree in violation of § 53a-134 (a) (1) for the robberies of Bouffard and Perkins. The defendant was also convicted of one count of robbery in the first degree in violation of § 53a-134 (a) (3) for robbery using a dangerous instrument.

[3] While in prison awaiting trial, the defendant wrote a letter to a friend in which she stated that she had "made a huge mistake" that resulted in "lives [being] lost." (Internal quotation marks omitted.)

[4] In her appeal before the Appellate Court, the defendant also claimed that insufficient evidence was presented at trial to support her conviction of attempted possession of narcotics. See *State* v. *Turner*, supra, 190 Conn. App. 696. This claim is not at issue in the present certified appeal.

[5] The defendant appealed from her conviction to this court, and we transferred the appeal to the Appellate Court. See General Statutes § 51-199 (c); Practice Book § 65-1. We subsequently granted the defendant's petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly uphold the defendant's conviction of robbery and felony murder based on a legally invalid but factually supported theory for the conviction?" *State* v. *Turner*, 333 Conn. 915, 216 A.3d 650 (2019).

[6] The case law that the defendant cites in support of the opposite conclusion is unavailing. The defendant relies heavily on the California Supreme Court's decision in *People* v. *Williams*, 57 Cal. 4th, 776, 786–89, 305 P.3d 1241, 161 Cal. Rptr. 3d 81 (2013). Although the majority in that decision

held that a larceny by false pretenses that precedes a use of force cannot serve as a predicate larceny for robbery under California law; see id., 788–89; the holding in that case turned on the language of California's robbery statute, which differs significantly from the language contained in § 53a-133. Unlike the relevant California statute, § 53a-133 covers the "use of physical force . . . for the purpose of . . . the retention [of the property] immediately after the taking . . . ." The defendant also mistakenly relies on *People* v. *Quinn*, 186 App. Div. 2d 691, 588 N.Y.S.2d 646 (1992), which makes clear that, under New York state law, a larceny by false pretenses can serve as the predicate felony for robbery if force is used "to overcome . . . resistance to the retention of the [property] 'immediately after the taking.' " Id., 692; see also, e.g., *People* v. *Saia*, 112 App. Div. 2d 804, 805, 492 N.Y.S.2d 306 (recognizing that robbery can be committed by threatening physical force for purpose of retaining property acquired by false pretenses), appeal denied, 66 N.Y.2d 617, 485 N.E.2d 244, 494 N.Y.S.2d 1040 (1985).

[7] The defendant implicitly concedes as much in her brief when she argues that "the bail larceny may have had a connection to the murder. But it did not have the legally required connection because the Turners had spent the stolen money."

[8] Specifically, the defendant states: "Here, the theft of money and gift cards from Bouffard's purse immediately after her death could support a [conviction of] robbery and felony murder . . . if the defendant knew ahead of time that [Claude] Turner was going to kill the victim to steal from her."

[9] The defendant's claim of instructional error is limited to the trial court's references to larceny by false pretenses in its robbery and felony murder instructions. The defendant does not allege that any other portion of the instructions was improper.

[10] We also note that, during the prosecutor's closing argument, he argued that, due to the defendant's direct involvement in the crimes leading up to the killings, "common sense" dictated that she was aware of Claude Turner's plan to kill the victims before it happened.

———————————————